OPINION OF THE COURT
Herman Cahn, J.
The Bank of New York Company, Inc. (BNY), plaintiff, moves for an order enjoining defendant Irving Bank Corporation (IBC) from enforcing a certain "rights” agreement as amended on March 15, 1988, and specifically enjoining the enforcement of the March 15, 1988 amendment.
THE FACTS
In September 1987 BNY announced its intention to com *666 menee a tender offer for all of the outstanding shares of IBC. It is unnecessary here to recite in detail the intricacies of the offer, its several amendments by BNY, and its rejection by the board of directors of IBC. Suffice it to state that the board of directors of IBC believes that acceptance of the offer is not beneficial for IBC’s shareholders, stemming in large part from the fact that Federal regulations limit the number of prospective tender offerors. However, these regulations have recently been modified, which modifications will slowly deregulate the banking system over the next few years. The result of the deregulation may be to allow more large banking institutions, not presently able to bid for IBC, to do so. It is asserted that this will produce an auction type bidding during which, it is believed, a higher price can be negotiated by the board of directors. This argument has presumably been communicated to IBC’s shareholders in response to BNY’s tender offer. On October 9, 1987 the board of IBC adopted a "rights” plan. Pursuant thereto, one right per share of outstanding common stock was made payable to shareholders of record on October 19, 1987. If an acquisition is approved by the board, the rights can be redeemed by the board at .01 per right. The right to redeem is exercisable prior to the time a person or entity obtains ownership or control of 20% or more of stock of IBC.
The rights become exercisable when certain triggering events occur and thereupon entitle the holders thereof to either purchase shares in IBC or in any new company formed as the result of an acquisition:
1) Ten days following an announcement that 20% or more of IBC’s outstanding common stock has been acquired by one person or entity, the rights issued entitle the holders thereof to purchase one share of IBC for $200. (This exercise price is much greater than the present or recent market value of a share of IBC[1] and therefore is properly labeled by plaintiffs as "illusory”, having "nothing to do with the reason for the poison pill.”)
2) If IBC is consolidated or merged with another company, or if 50% or more of IBC’s assets or earning power are transferred or sold, the rights entitle the holders thereof to purchase shares of common stock of the surviving company at 50% of market value. (This provision is commonly referred to as a "flip-over”.)
*667 The purpose for adopting the rights plan was to make it unattractive and unprofitable for IBC to be taken over by another company unless the board of directors of IBC approves the acquisition.
A. THE MARCH 15TH AMENDMENT
On March 15, 1988, approximately one month after BNY had commenced a proxy contest seeking election of a new board, the IBC board adopted an amendment to the heretofore described rights agreement. Said amendment, section 23, provided for the redemption of the rights by the board at any time "prior to such time as any person[2] becomes an acquiring person."[3] However, the basic thrust of section 23 is to severely limit the authority of any board of directors other than the present board to redeem the rights. The relevant portion of section 23 reads as follows: "the Board of Directors of the company shall be entitled so to redeem the Rights only if it consists of a majority of Continuing Directors (as hereinafter defined) or, if the Board of Directors of the Company is not so constituted, only if the members of the Board of Directors of the Company who are not Continuing Directors were elected to immediately succeed Continuing Directors and either (i) were elected by the affirmative vote of the holders of at least two-thirds of the issued and outstanding Shares of the Company or (ii) in connection with the election of the members of the Board of Directors of the Company who are not Continuing Directors, no merger, consolidation, liquidation, business combination or similar transaction or series of transactions with respect to the Company is or was proposed. The term 'Continuing Director’ shall mean a director who either was a member of the Board of Directors of the Company prior to March 15, 1988 or who subsequently became a director of the Company and whose election, or nomination for election by the Company’s shareholders, was approved by a vote of a majority of the Continuing Directors then on the Board of Directors of the Company.”
An analysis of the above will show that it creates several different classes of directors. The first are directors who were *668 in office prior to March 15, 1988, and who have all rights of directors. The second group are directors who are elected after March 15, 1988 and whose election was approved by a vote of the majority of the first group. This group also has all the rights of directors.
The third group are directors elected after March 15, 1988 and who have not postponed or agreed to certain actions relating to mergers. These are the actions which the first group has decided to block.
The fourth and final group are directors who were elected by the vote of the holders of at least two thirds of the shares. This group also has all the rights of directors.
It is to be further noted that a single plurality is required for election to the board.
What section 23 thus does is several things. First, it creates several different classes of directors — having different powers, or having to be elected by different majorities to exercise all of the powers. Second, it effectively limits the powers of a future board which is not a continuation of the present board or which .is not approved by it, while still leaving those powers to a board which is approved. For example, the present board, or one approved by it, may redeem the rights. A future board, properly elected by a 51% majority, but not approved by the present board, may not redeem the shares.
BNY and shareholders of IBC seek to enjoin enforcement of this provision. The court notes that section 23 as amended March 15, 1988 is the only provision of the rights agreement herein contested.
THE LAW
A. ENTITLEMENT TO A PRELIMINARY INJUNCTION
The law is well settled that in order to be entitled to a preliminary injunction the moving party must demonstrate the likelihood of success on the merits, irreparable harm absent the relief requested, and a balance of the equities in its favor. (Grant Co. v Srogi, 52 NY2d 496.)
IBC argues that irreparable harm is not a threat, but is speculative, that indeed the controversy is not yet ripe for adjudication since the issue may become mooted by the vote of the shareholders at the annual meeting, i.e., if they elect the old board, or give more than two thirds of their votes to the insurgent candidates, the issue will be mooted.
However, the presence of the amendment prior to the *669 election may be sufficiently relevant to the shareholders to strongly affect the outcome. Shareholders, aware of section 23, know that if they vote for BNY’s slate and a two-thirds vote is not achieved, the directors, then elected, will not, under the amendment, have the power to redeem the rights for 10 years. Therefore, any shareholder who would desire to accept this or any future tender offer and elect a board other than the current board or those approved by it, may be deterred from doing this at the meeting for fear that a majority vote less than two thirds would position a board incapable of any future negotiations for 10 years.
If the amendment is invalid, its presence is likely to taint the electoral process which a subsequent invalidation by this court will not cure.
"In this case, a preliminary adjudication in advance of the shareholders’ meeting appears to be the more sensible way to proceed. The harm threatened here is to the corporate electoral process, a process which carries with it the right of shareholders to a meaningful exercise of their voting franchise and to a fair proxy contest with an informed electorate.” (Packer & G&P Ind. Mgt. Corp. v Yampol, 54 USLW 2582 [Del Ch, Apr. 18, 1986, C. A. No. 8432].)
In addition, where a provision is illegally adopted in conflict with the statutory law, an injunction is appropriate regardless of the extent of the harm. (Schwab v Potter Co., 194 NY 409; Studebaker Corp. v Gittlin, 360 F2d 692; Prime Computer v Allen, Del Ch, Jan. 25, 1988, C. A. No. 9557, affd 538 A2d 1113 [Del, Jan. 26, 1988].)
The balance of the equities favors the resolution of the instant dispute prior to the election. If section 23 is valid, defendants are not harmed by a resolution at this stage; however, if invalid, plaintiffs, as stated above, may be irreparably harmed.
The court has not found any New York cases, other than Schwab v Potter Co. (supra), directly in point. However, the probability that the election would be unfairly tainted lends urgency to the issue. Since IBC has only one shareholders’ meeting a year, the taint could not be cured for one year, other than for the court to set aside the election. However, this also is not a valid alternative, since BNY’s time to act, if it wins the election, is seriously circumscribed by conditions imposed by the Federal Reserve Bank. Those conditions require expeditious action, if action there is to be.
*670 In the circumstances, the court will consider the application.
B. THE VALIDITY OF SECTION 23 UNDER THE BUSINESS CORPORATION LAW
Recently, there has been an abundance of case law recognizing the propriety of the adoption by the board of directors of a corporation of a rights plan, both as a preventative mechanism to ward off future tender offers (see, e.g., Moran v Household Intl., 500 A2d 1346), and as a defense measure during battle with a corporate raider (see, e.g., Revlon, Inc. v MacAndrews & Forbes Holdings, 506 A2d 173). These cases address the duties of directors to their corporations and their protections under the business judgment rule.
At issue here is not the propriety of the adoption of the plan, but rather the legality of section 23, the provision restricting the power of duly elected directors to conduct business of the corporation otherwise conductible by directors elected in a specified manner. The court turns, therefore, to the Business Corporation Law.
Business Corporation Law § 614 governs the voting requirements for the election of directors of a corporation: "(a) Directors shall, except as otherwise required by this chapter or by the certificate of incorporation as permitted by this chapter, be elected by a plurality of the votes cast at a meeting of shareholders by the holders of shares entitled to vote in the election.” (Emphasis added.) A duly elected board is empowered to manage the business of the corporation (Business Corporation Law § 701) by vote of a majority present, if a quorum is present at the time of the vote (Business Corporation Law § 708). A restriction of the board’s power to manage the business of the corporation is invalid unless (1) all of the incorporators or all of the shareholders of record have authorized such provision on the certificate of incorporation; (2) subsequent shareholders have notice of the provision; and (3) no shares of the corporation are listed on a national securities exchange or in an over-the-counter market. (Business Corporation Law § 620.)
By statute any restriction on the power of the board of directors must be placed in the certificate of incorporation (Business Corporation Law § 620; Polchinski Co. v Cemetery Floral Co., 79 AD2d 648) which was not done by IBC. Accordingly, the board of directors was without authority to adopt a provision restricting the action of a future board.
That a board could be elected which possesses the full power *671 to redeem the rights herein does not resolve the issue; IBC’s board went beyond its power when it adopted a provision which would require a supermajority vote for BNY’s slate in order to elect a new board. Again, no such provision was placed in the certificate of incorporation requiring such super-majority vote (Business Corporation Law § 614).
The evil of section 23 is not that it deprives a board of certain powers; it is that it is selective in the deprivation. In other words, the present board members could have the powers, if they were reelected to the board, but the insurgents would not if they were elected by the same plurality. Those new members of the board approved by the current board would have the powers, but those not so approved would not. This retention of authority is beyond the powers of the board.
It is no answer to say that the insurgents would possess all the powers, if elected by a supermajority. The illegal discrimination between boards is not thereby cured.
Defendant cites Staklinsky v Pyramid Elec. Co. (6 AD2d 565) for the proposition that the power of a board to enter into a long-term contract is analogous to the restriction herein, i.e., that the present board has the power to restrict corporate action and bind the corporation for long periods of time. However, when a board enters into a contract for the benefit of a corporation, not only is it carrying on the business of the corporation, but, if it did not have the power to do so, the business could not be carried on. In emphasis, the board may not enter into a contract which may be canceled only by that board if reelected, or by a board elected by a two-thirds vote (unless the certificate of incorporation so provides). The discrimination in boards, i.e., those we approve of have power, those we do not don’t have the power, in the absence of a supermajority, is contrary to the statute.
Accordingly, plaintiffs are entitled to declaratory relief enjoining defendant from applying section 23.
CONCLUSION
Plaintiff’s motion for injunctive relief is granted. Defendants are enjoined from enforcement of the rights plan section 23, as amended March 15, 1988.
In view of the above, the court has not reached the issue of fiduciary duty or the applicability of its business-judgment rule.

. For example, the market value of IBC at the close of business on April 13, 1988 was $65/share.

. A "person” is defined in the rights agreement as: "any individual, firm, corporation or other entity, and shall include any successor (by merger or otherwise) of such entity.”

. An "acquiring person” is defined as "any person * * * who or which * * * shall be the Beneficial Owner (as such term is hereinafter defined) of 20% or more of the shares then outstanding”.