**James CARMODY, individually and on behalf of all those similarly situated, Plaintiff,**

v.

**TOLL BROTHERS, INC., Robert I. Toll, Bruce E. Toll, Zvi Barzilay, Robert S. Blank, Richard J. Braemer, Roger J. Hillas, Carl B. Marbach, Joel H. Rassman and Paul E. Shapiro, Defendants.**

**C.A. No. 15983.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 15, 1998.

Decided: July 24, 1998.

Revised: July 27, 28 & Aug. 4, 1998.

---

8. *Avon Products, Inc. v. Wilson,* 513 A.2d at 1315.

Jay W. Eisenhofer, Stuart M. Grant, and Cynthia A. Calder, of Grant & Eisenhofer, P.A., Wilmington, for Plaintiff.

David J. Margules and Barry M. Klayman, of Wolf, Block, Schorr and Solis–Cohen L.L.P., Wilmington, for Defendants.

## OPINION

JACOBS, Vice Chancellor.

At issue on this Rule 12(b)(6) motion to dismiss is whether a most recent innovation in corporate antitakeover measures—the so-called "dead hand" poison pill rights plan—is subject to legal challenge on the basis that it violates the Delaware General Corporation Law and/or the fiduciary duties of the board of directors who adopted the plan. As explained more fully below, a "dead hand" rights plan is one that cannot be redeemed except by the incumbent directors who adopted the plan or their designated successors. As discussed below, the Court finds that the "dead hand" feature of the rights plan as described in the complaint (the "Rights Plan") is subject to legal challenge on both statutory and fiduciary grounds, and that because the complaint states legally cognizable claims for relief, the pending motion to dismiss must be denied.

## I. FACTS [1]

### A. Background Leading to Adoption of the Plan

The firm whose rights plan is being challenged is Toll Brothers (sometimes referred to as "the company"), a Pennsylvania-based Delaware corporation that designs, builds, and markets single family luxury homes in thirteen states and five regions in the United States. The company was founded in 1967 by brothers Bruce and Robert Toll, who are its Chief Executive and Chief Operating Officers, respectively, and who own approximately 37.5% of Toll Brothers' common stock. The company's board of directors has nine members, four of whom (including Bruce and Robert Toll) are senior executive officers. The remaining five members of the board are "outside" independent directors.[2]

From its inception in 1967, Toll Brothers has performed very successfully, and "went public" in 1986. As of June 3, 1997, the company had issued and outstanding 34,196,473 common shares that are traded on the New York Stock Exchange. After going public, Toll Brothers continued to enjoy increasing revenue growth, and it expects that trend to continue into 1998, based on the company's ongoing expansion, its backlog of home contracts, and a continuing strong industry demand for luxury housing in the regions it serves.

The home building industry of which the company is a part is highly competitive. For some time that industry has been undergoing consolidation through the acquisition process, and over the last ten years it has evolved from one where companies served purely local and regional markets to one where regional companies have expanded to serve markets throughout the country. That was accomplished by home builders in one region acquiring firms located in other regions.[3]

1. The facts recited herein are drawn from the well-pleaded allegations of the complaint, as is required on a Rule 12(b)(6) motion to dismiss. *Solomon v. Pathe Communications Corp.*, Del. Supr., 672 A.2d 35, 38 (1996).

2. One board member is a partner of a Philadelphia law firm that acted as counsel to the company in various matters, and that received approximately $128,000 in fees from the company in 1996. Because of that relationship, the plaintiff challenges the independence of that particular director. That issue is not reached on this motion.

3. For example, D.R. Horton (a Texas firm) acquired Regency Development (an Alabama firm), Kaufman and Broad (a California firm) acquired Oppal Jenkins Group (a New Mexico firm), and Toll Brothers acquired Geoffrey H. Edmonds & Associates (a Phoenix, Arizona firm).

Inherent in any such expansion-through-acquisition environment is the risk of a hostile takeover. To protect against that risk, the company's board of directors adopted the Rights Plan.

### B. *The Rights Plan*

The Rights Plan was adopted on June 12, 1997, at which point Toll Brothers' stock was trading at approximately $18 per share—near the low end of its established price range of $16 3/8 to $25 3/16 per share. After considering the industry economic and financial environment and other factors, the Toll Brothers board concluded that other companies engaged in its lines of business might perceive the company as a potential target for an acquisition. The Rights Plan was adopted with that problem in mind, but not in response to any specific takeover proposal or threat. The company announced that it had done that to protect its stockholders from "coercive or unfair tactics to gain control of the Company" by placing the stockholders in a position of having to accept or reject an unsolicited offer without adequate time.

### 1. The Rights Plan's "Flip In" and "Flip Over" Features [4]

The Rights Plan would operate as follows: there would be a dividend distribution of one preferred stock purchase right (a "Right") for each outstanding share of common stock as of July 11, 1997. Initially the Rights would attach to the company's outstanding common shares, and each Right would initially entitle the holder to purchase one thousandth of a share of a newly registered series Junior A Preferred Stock for $100. The Rights would become exercisable, and would

trade separately from the common shares, after the "Distribution Date," which is defined as the earlier of (a) ten business days following a public announcement that an acquiror has acquired, or obtained the right to acquire, beneficial ownership of 15% or more of the company's outstanding common shares (the "Stock Acquisition Date"), or (b) ten business days after the commencement of a tender offer or exchange offer that would result in a person or group beneficially owning 15% or more of the company's outstanding common shares. Once exercisable, the Rights remain exercisable until their Final Expiration Date (June 12, 2007, ten years after the adoption of the Plan), unless the Rights are earlier redeemed by the company.

The dilutive mechanism of the Rights is "triggered" by certain defined events. One such event is the acquisition of 15% or more of Toll Brothers' stock by any person or group of affiliated or associated persons. Should that occur, each Rights holder (except the acquiror and its affiliates and associates) becomes entitled to buy two shares of Toll Brothers common stock or other securities at half price. That is, the value of the stock received when the Right is exercised is equal to two times the exercise price of the Right. In that manner, this so-called "flip in" feature of the Rights Plan would massively dilute the value of the holdings of the unwanted acquiror. [5]

The Rights also have a standard "flip over" feature, which is triggered if after the Stock Acquisition Date, the company is made a party to a merger in which Toll Brothers is not the surviving corporation, or in which it is the surviving corporation and its common stock is changed or exchanged. In either

---

4. The description of the Rights Plan and how it works is derived from paragraphs 20–22 of the complaint, and from the company's Form 8A, referenced in paragraph 17 of the complaint and filed with the SEC on June 20, 1997.

5. The "flip-in" feature of a rights plan is triggered when the acquiror crosses the specified ownership threshold, regardless of the acquiror's intentions with respect to the use of the shares. At that point, rights vest in all shareholders other than the acquiror, and as a result, those holders become entitled to acquire additional shares of voting stock at a substantially discounted price,

usually 50% of the market price. Commonly, rights plans also contain a "flip-over" feature entitling target company shareholders (again, other than the acquiror) to purchase shares of the acquiring company at a reduced price. That feature is activated when, after a "flip-in" triggering event, the acquiror initiates a triggering event, such as a merger, self-dealing transaction, or sale of assets. *See* Shawn C. Lese, *Note, Preventing Control From the Grave: A Proposal for Judicial Treatment of Dead Hand Provisions in Poison Pills*, 96 Colum. L.Rev. 2175, 2180–81 (1996).

event, each Rights holder becomes entitled to purchase common stock of the acquiring company, again at half-price, thereby impairing the acquiror's capital structure and drastically diluting the interest of the acquiror's other stockholders.

The complaint alleges that the purpose and effect of the company's Rights Plan, as with most poison pills, is to make any hostile acquisition of Toll Brothers prohibitively expensive, and thereby to deter such acquisitions unless the target company's board first approves the acquisition proposal. The target board's "leverage" derives from another critical feature found in most rights plans: the directors' power to redeem the Rights at any time before they expire, on such conditions as the directors "in their sole discretion" may establish. To this extent there is little to distinguish the company's Rights Plan from the "standard model." What is distinctive about the Rights Plan is that it authorizes only a specific, defined category of directors—the "Continuing Directors"—to redeem the Rights. The dispute over the legality of this "Continuing Director" or "dead hand" feature of the Rights Plan is what drives this lawsuit.

## 2. The "Dead Hand" Feature of the Rights Plan

In substance, the "dead hand" provision operates to prevent any directors of Toll Brothers, except those who were in office as of the date of the Rights Plan's adoption (June 12, 1997) or their designated successors, from redeeming the Rights until they expire on June 12, 2007. That consequence flows directly from the Rights Agreement's definition of a "Continuing Director," which is:

(i) any member of the Board of Directors of the Company, while such person is a member of the Board, who is not an Acquiring Person, or an Affiliate [as defined] or Associate [as defined] of an Acquiring

**6.** Complaint at ¶ 24, quoting Rights Agreement, § 1(g) (emphasis added).

**7.** Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099, 1105 (1985); *In re USACafes L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991); *In re Fuqua Indus., Inc.*

Person, or a representative or nominee of an Acquiring Person or of any such Affiliate or Associate, *and was a member of the Board prior to the date of this agreement,* or (ii) any Person who subsequently becomes a member of the Board, while such Person is a member of the Board, who is not an Acquiring Person, or an Affiliate [as defined] or Associate [as defined] of an Acquiring Person, or a representative or nominee of an Acquiring Person or of any such Affiliate or Associate, if such Person's *nomination for election or election to the Board is recommended or approved by a majority of the Continuing Directors.*[6]

According to the complaint, this "dead hand" provision has a twofold practical effect. First, it makes an unsolicited offer for the company more unlikely by eliminating a proxy contest as a useful way for a hostile acquiror to gain control, because even if the acquiror wins the contest, its newly-elected director representatives could not redeem the Rights. Second, the "dead hand" provision disenfranchises, in a proxy contest, all shareholders that wish the company to be managed by a board empowered to redeem the Rights, by depriving those shareholders of any practical choice except to vote for the incumbent directors. Given these effects, the plaintiff claims that the only purpose that the "dead hand" provision could serve is to discourage future acquisition activity by making any proxy contest to replace incumbent board members an exercise in futility.

## II. OVERVIEW OF THE PROBLEM AND THE PARTIES' CONTENTIONS

A motion to dismiss under Court of Chancery Rule 12(b)(6) will not be granted unless the Court is reasonably certain that the plaintiff would not be entitled to relief under any set of facts that could reasonably be inferred from the complaint.[7] In that procedural setting the truth of all well-pleaded allegations in the complaint is assumed.[8]

*Shareholder Litig.*, Del. Ch., C.A. No. 11974, Chandler, V.C., 1997 WL 257460 (May 13, 1997).

**8.** *Solomon v. Pathe Communications Corp.*, n. 1, *supra.*

Thus, on this motion the focus of the inquiry is not whether the Rights Plan is invalid, but rather, is only whether the complaint states one or more cognizable claims of legal invalidity.

## A. Overview

The critical issue on this motion is whether a "dead hand" provision in a "poison pill" rights plan is subject to legal challenge on the basis that it is invalid as *ultra vires*, or as a breach of fiduciary duty, or both. Although that issue has been the subject of scholarly comment,[9] it has yet to be decided under Delaware law, and to date it has been addressed by only two courts applying the law of other jurisdictions.[10]

Some history may elucidate the issue by locating its relevance within the dynamic of state corporate takeover jurisprudence. Since the 1980s, that body of law, largely judge-made, has been racing to keep abreast of the ever-evolving and novel tactical and strategic developments so characteristic of this important area of economic endeavor that is swiftly becoming a permanent part of our national (and international) economic landscape.

For our purposes, the relevant history begins in the early 1980s with the advent of the "poison pill" as an antitakeover measure.

That innovation generated litigation focused upon the issue of whether any poison pill rights plan could validly be adopted under state corporation law. The seminal case, *Moran v. Household International, Inc.*,[11] answered that question in the affirmative.

In *Moran*, this Court and the Supreme Court upheld the "flip over" rights plan in issue there based on three distinct factual findings. The first was that the poison pill would not erode fundamental shareholder rights, because the target board would not have unfettered discretion arbitrarily to reject a hostile offer or to refuse to redeem the pill. Rather, the board's judgment not to redeem the pill would be subject to judicially enforceable fiduciary standards. The second finding was that even if the board refused to redeem the pill (thereby preventing the shareholders from receiving the unsolicited offer), that would not preclude the acquiror from gaining control of the target company, because the offeror could "form a group of up to 19.9% and solicit proxies for consents to remove the Board and redeem the Rights."[12] Third, even if the hostile offer was precluded, the target company's stockholders could always exercise their ultimate prerogative— wage a proxy contest to remove the board. On this basis, the Supreme Court concluded that "the Rights Plan will not have a severe

9. *See, e.g.,* Shawn C. Lese, *Note, Preventing Control From the Grave: A Proposal for Judicial Treatment of Dead Hand Provisions in Poison Pills,* 96 Col. L.Rev. 2175 (1996) (cited herein as "Lese"); Jeffrey N. Gordon, *"Just Say Never" Poison Pills, Deadhand Pills and Shareholder Adopted By–Laws: An Essay for Warren Buffett,* 19 Cardozo L.Rev. 511 (1997) (cited herein as "Gordon"); Daniel A. Neff, *The Impact of State Statutes and Continuing Director Rights Plans,* 51 U. Miami L.Rev. 663 (1997) (cited herein as "Neff"); and Meredith M. Brown and William D. Regner, *2 Shareholder Rights Plans: Recent Toxopharmological Developments, Insights* (Aspen, Law & Business, Oct., 1997) (cited herein as "Brown and Regner").

10. The jurisdictions that have directly addressed the legality of the dead hand poison pill are New York, *see Bank of New York Co., Inc. v. Irving Bank Corp., et. al.,* N.Y. Sup.Ct., 139 Misc.2d 665, 528 N.Y.S.2d 482 (1988), and the United States District Court for the Northern District of Georgia, *see Invacare Corp. v. Healthdyne Technologies. Inc.,* N.D. Ga., 968 F.Supp. 1578 (1997) (applying Georgia law). In Delaware, the issue

arose in *Davis Acquisition, Inc. v. NWA, Inc.,* Del. Ch., C.A. No. 10761, Allen, C., 1989 WL 40845 (Apr. 25, 1989), but was not decided because the preliminary injunction motion was resolved on other grounds. In *Sutton Holding Corp. v. DeSoto, Inc.,* Del. Ch., C.A. No. 12051, Allen, C, 1991 WL 80223 (May 13, 1991) the validity of a "continuing director" provision was presented indirectly (but again was not decided) in the context of an amendment to a pension plan prohibiting its termination or a reduction of benefits in the event of a "change of control." That term was defined as a new, substantial shareholder becoming the beneficial owner of 35% or more of the corporation's voting stock without the prior approval of two thirds of the board and a majority of the "continuing directors."

11. Del. Ch., 490 A.2d 1059, 1072, *aff'd,* Del. Supr., 500 A.2d 1346 (1985) ("*Moran* ").

12. *Moran,* 500 A.2d at 1354. The rights plan at issue there had a 20% acquisition trigger, but no continuing director provision. That innovation would not surface on a widespread basis until years later.

impact upon proxy contests and it will not preclude all hostile acquisitions of Household." [13]

It being settled that a corporate board could permissibly adopt a poison pill, the next litigated question became: under what circumstances would the directors' fiduciary duties require the board to redeem the rights in the face of a hostile takeover proposal? [14] That issue was litigated, in Delaware and elsewhere, during the second half of the 1980s. The lesson taught by that experience was that courts were extremely reluctant to order the redemption of poison pills on fiduciary grounds. The reason was the prudent deployment of the pill proved to be largely beneficial to shareholder interests: it often resulted in a bidding contest that culminated in an acquisition on terms superior to the initial hostile offer.

Once it became clear that the prospects were unlikely for obtaining judicial relief mandating a redemption of the poison pill, a different response to the pill was needed. That response, which echoed the Supreme Court's suggestion in *Moran*, was the foreseeable next step in the evolution of takeover strategy: a tender offer coupled with a solicitation for shareholder proxies to remove and replace the incumbent board with the acquiror's nominees who, upon assuming office, would redeem the pill.[15] Because that strategy, if unopposed, would enable hostile offerors to effect an "end run" around the poison pill, it again was predictable and only a matter of time that target company boards would develop counter-strategies. With one exception—the "dead hand" pill—these counter-strategies proved "successful" only in cases where the purpose was to delay the process to enable the board to develop alternatives to the hostile offer. The counterstrategies were largely unsuccessful, however, where the goal was to stop the proxy contest (and as a consequence, the hostile offer) altogether.

For example, in cases where the target board's response was either to (i) amend the by-laws to delay a shareholders meeting to elect directors, or (ii) delay an annual meeting to a later date permitted under the by-laws, so that the board and management would be able to explore alternatives to the hostile offer (but not entrench themselves), those responses were upheld.[16] On the other hand, where the target board's response to a proxy contest (coupled with a hostile offer) was (i) to move the shareholders meeting to a later date to enable the incumbent board to solicit revocations of proxies to defeat the apparently victorious dissident group, or (ii) to expand the size of the board, and then fill the newly created positions so the incumbents would retain control of the board irrespective of the outcome of the proxy contest, those responses were declared invalid.[17]

This litigation experience taught that a target board, facing a proxy contest joined with a hostile tender offer, could, in good

---

**13.** *Moran,* 500 A.2d at 1356.

**14.** Brown & Regner, n. 9, *supra.*

**15.** *See, Unitrin, Inc. v. American General Corp.,* Del.Supr., 651 A.2d 1361, 1379 (1995); *Kidsco, Inc. v. Dinsmore,* Del. Ch., 674 A.2d 483, 490 (1995), *aff'd,* 670 A.2d 1338 (1995).

**16.** *See, e.g., Stahl v. Apple Bancorp, Inc.,* Del. Ch., 579 A.2d 1115 (1990) (upholding postponement of annual meeting to a later date permitted by bylaws to enable target board to explore alternatives to hostile offer); *Kidsco Inc. v. Dinsmore,* n. 15, *supra,* (upholding amendment of bylaws to give target board an additional 25 days before calling a shareholder-initiated special meeting, to enable shareholders to vote on a pending merger proposal, and, if the proposal were defeated, to enable the board to explore other alternatives).

**17.** *See, Aprahamian v. HBO & Co.,* Del Ch., 531 A.2d 1204 (1987) (shareholders' meeting moved to later date for the purpose of defeating the apparent victors in proxy contest. Held: invalid); *Blasius Indus. v. Atlas Corp.,* Del. Ch., 564 A.2d 651(1988) (in response to an announced proxy contest, target board amended bylaws to create two new board positions, then filled those positions to retain board control, irrespective of outcome of proxy contest. Held: invalid).

Another statutorily permissible defensive device—the "staggered" or classified board—was useful, but still of limited effectiveness. Because only one third of a classified board would stand for election each year, a classified board would delay—but not prevent—a hostile acquiror from obtaining control of the board, since a determined acquiror could wage a proxy contest and obtain control of two thirds of the target board over a two year period, as opposed to seizing control in a single election.

faith, employ non-preclusive defensive measures to give the board time to explore transactional alternatives. The target board could not, however, erect defenses that would either preclude a proxy contest altogether or improperly bend the rules to favor the board's continued incumbency.

In this environment, the only defensive measure that promised to be a "show stopper" (*i.e.*, had the potential to deter a proxy contest altogether) was a poison pill with a "dead hand" feature. The reason is that if only the incumbent directors or their designated successors could redeem the pill, it would make little sense for shareholders or the hostile bidder to wage a proxy contest to replace the incumbent board. Doing that would eliminate from the scene the only group of persons having the power to give the hostile bidder and target company shareholders what they desired: control of the target company (in the case of the hostile bidder) and the opportunity to obtain an attractive price for their shares (in the case of the target company stockholders). It is against that backdrop that the legal issues presented here, which concern the validity of the "dead hand" feature, attain significance.

### B. *The Contentions*

The defendants advance three reasons why this challenge to the validity of the "dead hand" pill should be dismissed. *First*, they argue that the plaintiff's claims are not ripe and cannot become ripe for adjudication, unless and until (i) a specific acquisition is proposed to which the Continuing Directors object and (ii) the Continuing Directors refuse to redeem the Rights so as to enable the shareholders to consider the acquisition proposal and decide whether or not to accept it. *Second*, the defendants contend that even if the claims are ripe, they must be dismissed under Chancery Court Rule 23.1, because the claims are derivative and the plaintiff has failed to make a pre-suit demand on the

board or plead facts that would excuse a demand. *Third*, the defendants argue that in any event, the complaint fails to state a claim upon which relief can be granted, because the "dead hand" provision violates no duty imposed either by statute or corporate fiduciary principles.[18] These dismissal arguments are addressed in that sequence.

### III. *ANALYSIS*

#### A. *The "Ripeness" and "Derivative Claim" Defenses*

#### 1. The Ripeness Argument

Because they are easily disposed of, the Court considers first the defendants' threshold arguments that (a) the plaintiff's claims are not ripe, but (b) even if ripe, the claims must be dismissed because they are derivative and, therefore, subject to the demand requirement of Court of Chancery Rule 23.1, which the plaintiff has not satisfied. Neither defense, in my view, has merit.

The ripeness argument runs as follows: the harm claimed to flow from the "dead hand" provision is improper interference with the shareholders' right to vote.[19] That harm cannot occur unless there is a specific hostile takeover proposal that involves a proxy contest in which the acquiror seeks to replace the incumbent board with its own nominees who, if elected, would redeem the pill. The complaint alleges no such specific hostile acquisition proposal. Moreover, because the Toll Brothers board is "staggered" into three classes, the "dead hand" provision could not cause any cognizable harm unless and until the hostile bidder (i) first makes a fair offer which it commits to keep open for more than one year, (ii) then successfully conducts two proxy fights that replace two-thirds of the incumbent board, and also (iii) commits to conduct a third proxy fight to replace the remaining minority of "Continuing" Directors, and (iv) during this entire time the Continuing Directors obdurately refuse to

---

18. Because the contentions concerning the legality of the dead hand provision are the most critical, they are addressed separately, and elaborated in detail, in Part III B, *infra*.

19. The basis for the "vote interference" claim is that any shareholder vote to elect a new board

that would dismantle the poison pill would be an exercise in futility, because only the Continuing Directors (the incumbent board or their designees) would have the power to redeem the Rights.

redeem the Rights even though the bidder's offer is fair. The defendants urge that because none of these events has occurred, the plaintiff's claims are not ripe for adjudication.

Stripped of its bells and whistles, this argument boils down to the proposition that the adoption of a facially invalid rights plan, on a "clear day" where there is no specific hostile takeover proposal, can never be the subject of a legal challenge. Not surprisingly, the defendants cite no authority which supports that proposition, nor could they, since the case law holds to the contrary.

In *Moran*, the defendants made, and this Court rejected, the same ripeness argument being advanced here:

Although plaintiffs' claims plainly are predicated on the triggering of the rights and the dilution associated with the flip-over provision, the plaintiffs have not initiated this action to prevent harm that may accrue to a potential acquiror as a result of the possible dilution of its capital. Rather, plaintiffs are contesting the Plan's present effect on their entitlement to receive and consider takeover proposals and to engage in a proxy fight for control of Household. They also are contesting the validity of the rights under the Delaware General Corporation Law. To this extent, the plaintiffs' suit involves the alleged present depressing effect of the Rights Plan on shareholder interests, regardless of whether the rights are in fact ever triggered.... [T]he plaintiffs here are seeking a declaration that the Rights Plan, because of its deterrent features, presently affects shareholders' fundamental rights and is illegal under Delaware law.

Household also maintains that because the board must be presumed, under the business judgment rule, to have a willingness to consider all takeover proposals and redeem the rights to permit an attractive takeover bid to proceed, the shareholders are precluded from challenging the Rights Plan at this time but must await board

action in a specific takeover situation.... Household will not be permitted to argue lack of ripeness in this bootstrap fashion.[20]

██ Here, as in *Moran*, the plaintiff complains of the Rights Plan's (specifically, its "dead hand" feature's) *present* depressing and deterrent effect upon the shareholders' interests, in particular, the shareholders' *present* entitlement to receive and consider takeover proposals and to vote for a board of directors capable of exercising the full array of powers provided by statute, including the power to redeem the poison pill. Because of their alleged *current* adverse impact, the plaintiff's claims of statutory and equitable invalidity are ripe for adjudication, for the reasons articulated by the Supreme Court in *Moran*.

## 2. The "Derivative Claim" Defense

Also misguided is the argument that the invalidity claims are derivative and must be dismissed under Rule 23.1 for failure to make a pre-suit demand or plead facts establishing that a demand would be futile. That argument lacks merit because the plaintiff's claims are individual, not derivative, and even if the claims were derivative, the complaint satisfies the requirements for demand excusal.

 Our Supreme Court has recognized that in litigation involving a challenge to defensive takeover tactics, the line between derivative and individual actions is often vague.[21] Pivotal to the analysis here are the plaintiff's allegations that the "dead hand" provision has both the effect and purpose of deterring proxy contests to replace the incumbent board, thereby entrenching the incumbents in control. Although entrenchment claims may be either individual or derivative, "[a]n entrenchment claim ... [is] ... individual ... when the shareholder alleges that the entrenching activity directly impairs some right she possesses as a shar-

---

20. *Moran*, 490 A.2d at 1072; *accord, In re Chrysler Corporation Shareholders Litigation*, Del Ch., C.A. No. 11873, Jacobs, V.C., 1992 WL 181024 (July 27, 1992), 18 Del. J. Corp. L. 619, at 625 ["Clearly ripe is the complaint's claim for rescission of the board's ... amendments to the Rights

Plan (including the trigger reduction), even absent an actual or threatened proxy contest."]

21. *Kramer v. Western Pacific Industries*, Del. Supr., 546 A.2d 348, 352 n. 3 (1988).

holder."[22] The complaint alleges an entrenching activity that directly impairs the shareholders' voting rights.[23] Specifically, it claims that by rendering any shareholder vote to replace the board an exercise in futility insofar as the goal of redeeming the Rights is concerned, the "dead hand" provision purposefully interferes with the shareholders' right to elect a new board having the full array of powers authorized by statute and the corporation's charter. Because the right to vote is a contractual right and an attribute of the Toll Brothers shares, the claimed wrongful interference with that right states an individual cause of action.[24]

 Even if the claims were regarded as derivative, the complaint's entrenchment allegations are sufficient to excuse compliance with the demand requirement. A demand is deemed excused if the complaint's particularized factual allegations create a reason to doubt that the board would consider the demand in a disinterested, impartial manner.[25] The complaint in this case alleges in a particularized way that the Toll Brothers directors acted for entrenchment purposes. Under our case law, that is sufficient to excuse the requirement of a demand.[26]

Having considered and rejected the threshold defenses, the Court turns to the crux of this case—the validity under Delaware law of the "dead hand" feature of the Toll Brothers Rights Plan.

## B. *The Validity of the "Dead Hand" Provision*

### 1. The Invalidity Contentions

The plaintiff's complaint attacks the "dead hand" feature of the Toll Brothers poison pill on both statutory and fiduciary duty grounds. The statutory claim is that the "dead hand" provision unlawfully restricts the powers of future boards by creating different classes of directors—those who have the power to redeem the poison pill, and those who do not. Under 8 *Del. C.* §§ 141(a) and (d), any such restrictions and director classifications must be stated in the certificate of incorporation.[27] The complaint alleges that because those restrictions are not stated in the Toll Brothers charter, the "dead hand" provision of the Rights Plan is ultra vires and, consequently, invalid on its face.[28]

The complaint also alleges that even if the Rights Plan is not *ultra vires*, its approval constituted a breach of the Toll Brothers board's fiduciary duty of loyalty in several

---

**22.** *Avacus Partners, L.P. v. Brian*, Del. Ch., C.A. No. 11001, Allen, C., Mem. Op. at 13, 1990 WL 161909 (Oct. 24, 1990).

**23.** *Id.* ("What has arguably been affected is not a corporate property or right, but the right of shareholders to elect the board without unfair manipulation.").

**24.** *Lipton v. News Int'l. Plc*, Del.Supr., 514 A.2d 1075, 1079 (1986).

**25.** *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 814 (1984); *Grimes v. Donald*, Del.Supr., 673 A.2d 1207, 1216–17 (1996).

**26.** *In re Chrysler Corporation Shareholders Litigation*, n. 20, *supra*, (quoting *Moran*, 490 A.2d at 1071) ("The [allegations] that the Rights Plan deters all hostile takeover attempts through its limitation on ... the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings."); *Wells Fargo & Company v. First Interstate Bancorp.*, Del. Ch., C.A. No. 14696, Allen, C. at *18, 1996 WL 32169 (Jan. 18, 1996) (entrenchment claims

found sufficient to raise "a reasonable doubt concerning the board's ability to make a binding business judgment.").

**27.** The plaintiff also relies upon the doctrine that prohibits a board of directors from entering into contracts or other arrangements that would amount to an abdication or substantial restriction of the board's statutory power to manage the corporation. *See, Grimes v. Donald*, Del. Ch., C.A. No 13358, Allen, C., Mem. Op. at 7, 1995 WL 54441 (Jan. 11, 1995), *aff'd.*, Del.Supr., 673 A.2d 1207 (1996); *Abercrombie v. Davies*, Del. Ch., 123 A.2d 893 (1956).

**28.** At oral argument the plaintiff raised, for the first time, a separate statutory invalidity argument, namely, that even if the "dead hand" provision had been expressed in the certificate of incorporation, that provision would still run afoul of the Delaware General Corporation Law. Implicit in that argument is the proposition that our corporation statute deprives the shareholders of the power to contract for that particular kind of restriction on directorial power. Because this contention was not fairly presented or addressed in the briefing, it comes too late and is not considered on this motion.

respects. It is alleged that the board violated its duty of loyalty because (a) the "dead hand" provision was enacted solely or primarily for entrenchment purposes; (b) it was also a disproportionate defensive measure, since it precludes the shareholders from receiving tender offers and engaging in a proxy contest, in contravention of the principles of *Unocal Corp. v. Mesa Petroleum Co.* ("*Unocal* "),[29] as elucidated in *Unitrin, Inc. v. American General Corp.* ("*Unitrin*")[30] and (c) the "dead hand" provision purposefully interferes with the shareholder voting franchise without any compelling justification, in derogation of the principles articulated in *Blasius Indus. v. Atlas Corp.* ("*Blasius* ").[31]

The defendants contend that none of these claims is cognizable under Delaware law. They urge that the Rights Plan is not invalid per se, because it does not purport to preclude or interfere with proxy contests as a means to gain control, and it does not force shareholders to vote for the incumbent directors or against any opposing candidates. The defendants do concede that the "dead hand" provision gives one category of directors (the Continuing Directors) more power than the remaining directors. They argue, however, that that does not violate the General Corporation Law, because boards of Delaware corporations may lawfully delegate specific tasks (and the power to perform those tasks) to a special committee of less than the full board without any requirement that the committee's delegated powers be spelled out in the certificate of incorporation. The defendants contend that the adoption of the Toll Brothers "dead hand" provision should be viewed as tantamount to a delegation to a special committee of the board (the Continuing Directors) of the exclusive power to redeem the Rights.

The defendants further argue that the Rights Plan does not violate any fiduciary duty under *Unocal/Unitrin* or *Blasius*, be-

cause a majority of the company's board were independent directors who reasonably perceived a threat to Toll Brothers' ability to carry out its business objectives if the company remained vulnerable to a hostile takeover. They also contend that adopting the Rights Plan was a proportionate response that the "dead hand" feature did not render disproportionate, because the Rights Plan does not preclude offers that are fair and noncoercive. Finally, the defendants argue that the Rights Plan does not prevent the shareholders from electing a new board, and even though that board may be unable to redeem the Rights, that violates no fiduciary duty, because even Blasius permits a board to interfere with the voting process in sufficiently compelling circumstances. Because the Rights Plan survives scrutiny under *Unocal/Unitrin* and *Blasius*, the defendants conclude that the Plan is protected by the "powerful presumption" of validity conferred by the business judgment rule, which the complaint's allegations have failed to overcome as a matter of law.[32]

For the reasons next discussed, the Court determines that the defendants' pro-dismissal arguments must be rejected.

## 2. The Statutory Invalidity Claims

Having carefully considered the arguments and authorities marshaled by both sides, the Court concludes that the complaint states legally sufficient claims that the "dead hand" provision of the Toll Brothers Rights Plan violates 8 *Del. C.* §§ 141(a) and (d). There are three reasons.

■ *First*, it cannot be disputed that the Rights Plan confers the power to redeem the pill only upon some, but not all, of the directors. But under § 141(d), the power to create voting power distinctions among directors exists only where there is a classified board, and where those voting power distinctions are expressed in the certificate of incor-

---

**29.** Del.Supr., 493 A.2d 946 (1985).

**30.** Del.Supr., 651 A.2d 1361, 1372–74(1995).

**31.** Del. Ch., 564 A.2d 651, 662–63 (1988).

**32.** The defendants also argue that the fiduciary duty claims are premature, because they cannot

arise unless and until the directors refuse to redeem the Rights in the face of a specific offer. That contention is essentially a reprise of the "ripeness" argument in slightly different form, and is rejected for the reasons previously discussed in the ripeness context.

poration. Section 141(d) pertinently provides:

> ... *The certificate of incorporation may confer upon holders of any class or series of stock the right to elect 1 or more directors who shall* serve for such term, *and have such voting powers as shall be stated in the certificate of incorporation.* The terms of office and voting powers of the directors elected in the manner so provided in the certificate of incorporation may be greater than or less than those of any other director or class of directors .... (emphasis added)

The plain, unambiguous meaning of the quoted language is that if one category or group of directors is given distinctive voting rights not shared by the other directors, those distinctive voting rights must be set forth in the certificate of incorporation. In the case of Toll Brothers (the complaint alleges), they are not.

■ *Second,* § 141(d) mandates that the "right to elect 1 or more directors who shall ... have such [greater] voting powers" is reserved to the stockholders, not to the directors or a subset thereof. Absent express language in the charter, nothing in Delaware law suggests that some directors of a public corporation may be created less equal than other directors, and certainly not by unilateral board action.[33] Vesting the pill redemption power exclusively in the Continuing Directors transgresses the statutorily protected shareholder right to elect the directors who would be so empowered. For that reason, and because it is claimed that the Rights Plan's allocation of voting power to redeem the Rights is nowhere found in the Toll Brothers certificate of incorporation, the complaint states a claim that the "dead hand" feature of the Rights Plan is *ultra vires,* and hence, statutorily invalid under Delaware law.

■ *Third,* the complaint states a claim that the "dead hand" provision would impermissibly interfere with the directors' statutory power to manage the business and affairs

of the corporation. That power is conferred by 8 *Del. C.* § 141(a), which mandates:

> The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, *except as may be otherwise provided in this chapter or in its certificate of incorporation* .... (emphasis added)

The "dead hand" poison pill is intended to thwart hostile bids by vesting shareholders with preclusive rights that cannot be redeemed except by the Continuing Directors. Thus, the one action that could make it practically possible to redeem the pill—replacing the entire board—could make that pill redemption legally impossible to achieve.[34] The "dead hand" provision would jeopardize a newly-elected future board's ability to achieve a business combination by depriving that board of the power to redeem the pill without obtaining the consent of the "Continuing Directors," who (it may be assumed) would constitute a minority of the board. In this manner, it is claimed, the "dead hand" provision would interfere with the board's power to protect fully the corporation's (and its shareholders') interests in a transaction that is one of the most fundamental and important in the life of a business enterprise.[35]

The statutory analysis employed, and the result reached here, are consistent with and supported by *Bank of New York Co. v. Irving Bank Corp.*[36] There, the New York Supreme Court invalidated a "continuing director" provision that the target company board had adopted as an amendment to a preexisting rights plan, as a defense against a tender offer/proxy contest initiated by a hostile bidder. The New York court observed that the continuing director provision at issue there created several different classes of directors having different powers, and that it also

> effectively limits the powers of the future board which is not a continuation of the

---

**33.** Gordon, 19 Cardozo L.Rev. at 537.

**34.** *Id.* at 537–38.

**35.** *Id.* at 538.

**36.** *See,* n. 10, *supra,* 528 N.Y.S.2d 482.

present board or which is not approved by it, while still leaving those powers to a board which is approved. For example, the present board, or one approved by it, may redeem the rights. A future board, properly elected by a fifty-one percent majority, but not approved by the present board, may not redeem the shares.[37]

Those observations apply equally here.

In *Bank of New York*, the court found that the continuing director provision violated the New York Business Corporation Law requirement that restrictions upon the board's powers are invalid, unless all the incorporators or all shareholders of record authorize the inclusion of the limitations or restrictions in the certificate of incorporation. Although the relevant language of the Delaware and New York statutes is not identical, their underlying intent is the same: both statutes require that limitations upon the directors' power be expressed in the corporation's charter. In *Bank of New York*, the rights plan was determined to be invalid because the target company's certificate of incorporation contained no such limitation. Neither (it is alleged) does the Toll Brothers certificate.

■■ The defendants offer two arguments in response. First, they contend that the Rights Plan does not facially preclude or interfere with proxy contests as a means to gain control, or coerce shareholders to vote for or against any particular director slate. The second argument is that the "dead hand" provision is tantamount to a delegation to a special committee, consisting of the Continuing Directors, of the power to redeem the pill.

Neither contention has merit. The first is basically an argument that the Rights Plan does not violate any fiduciary duty of the board. That is unresponsive to the statutory invalidity claim. The second argument rests upon an analogy that has no basis in fact. In adopting the Rights Plan, the board did not, nor did it purport to, create a special committee having the exclusive power to redeem the pill. The analogy also ignores fundamental structural differences between the creation of a special board committee and the operation of the "dead hand" provision of the Rights Plan. The creation of a special committee would not impose long term structural power-related distinctions between different groups of directors of the same board. The board that creates a special committee may abolish it at any time, as could any successor board. On the other hand, the Toll Brothers "dead hand" provision, if legally valid, would embed structural power-related distinctions between groups of directors that no successor board could abolish until after the Rights expire in 2007.

For these reasons, the statutory invalidity claims survive the motion to dismiss.[38]

### 3. The Fiduciary Duty Invalidity Claims

Because the plaintiffs statutory invalidity claims have been found legally cognizable, the analysis arguably could end at this point. But the plaintiff also alleges that the board's adoption of the "dead hand" feature violated

---

**37.** 528 N.Y.S.2d at 484.

**38.** The defendants rely upon *Invacare Corp. v. Healthdyne Technologies, Inc.*, 968 F.Supp. 1578 (N.D.Ga.1997). That case is distinguishable and inapposite. In *Invacare*, the United States District Court for the Northern District of Georgia, applying Georgia law, upheld a "continuing director" provision of a target company's rights plan. It was argued that the continuing director provision was invalid because it imposed significant limitations upon the board's powers that should have been, but were not, included in the articles of incorporation or the bylaws, as Georgia's corporation statute required. The court rejected that argument. Distinguishing *Bank of New York* the court held that the Georgia Business Corporation Code had no statutory requirement mandating that limitations on the directors' power be expressed in the certificate of incorporation. That court noted that the Georgia statute gave the board "sole discretion" to determine the terms and conditions of a rights plan, and that the Official Comment stated that the board's discretion is limited only by its fiduciary obligations to the corporation. The court also found that the Georgia Fair Price statutory provision, which required unanimous approval by the "continuing directors" or recommendation by at least two thirds of the "continuing directors" and approval by a specified percentage of shareholder votes, supported the conclusion that "Georgia corporate law embraces the concept of continuing directors as part of a defense against hostile takeovers." 968 F.Supp. at 1580. The relevant Delaware corporate statutory scheme, like New York's, differs materially from that of Georgia.

its fiduciary duty of loyalty. For the sake of completeness, that claim is addressed as well.

The duty of loyalty claim, to reiterate, has two prongs. The first is that the "dead hand" provision purposefully interferes with the shareholder voting franchise without any compelling justification, and is therefore unlawful under *Blasius*. The second is that the "dead hand" provision is a "disproportionate" defensive measure, because it either precludes or materially abridges the shareholders' rights to receive tender offers and to wage a proxy contest to replace the board. Under *Unocal/Unitrin*, in such circumstances the board's approval of the "dead hand" provision would not enjoy the presumption of validity conferred by the business judgment review standard, and therefore would be found to constitute a breach of fiduciary duty.

I conclude, for the reasons next discussed, that both fiduciary duty claims are cognizable under Delaware law.

### a) The *Blasius* Fiduciary Duty Claim

The validity of antitakeover measures is normally evaluated under the *Unocal/Unitrin* standard. But where the defensive measures purposefully disenfranchise shareholders, the board will be required to satisfy the more exacting *Blasius* standard, which our Supreme Court has articulated as follows: [39]

A board's unilateral decision to adopt a defensive measure touching "upon issues of control" that purposefully disenfranchises its shareholders is strongly suspect under *Unocal*, and cannot be sustained without a "compelling justification."

The complaint alleges that the "dead hand" provision purposefully disenfranchises the company's shareholders without any compelling justification. The disenfranchisement would occur because even in an election contest fought over the issue of the hostile bid, the shareholders will be powerless to elect a board that is both willing and able to accept the bid, and they "may be forced to vote for [incumbent] directors whose policies they reject because only those directors have the power to change them." [40]

A claim that the directors have unilaterally "create[d] a structure in which shareholder voting is either impotent or self defeating" [41] is necessarily a claim of purposeful disenfranchisement. Given the Supreme Court's rationale for upholding the validity of the poison pill in *Moran*, and the primacy of the shareholder vote in our scheme of corporate jurisprudence, any contrary view is difficult to justify. In *Moran*, the Supreme Court upheld the adoption of a poison pill, in part because its effect upon a proxy contest would be "minimal," [42] but also because if the board refused to redeem the plan, the shareholders could exercise their prerogative to remove and replace the board. In *Unocal* the Supreme Court reiterated that view—that the safety valve which justifies a board being allowed to resist a hostile offer a majority of shareholders might prefer, is that the shareholders always have their ultimate recourse to the ballot box.[43] Those observations reflect the fundamental value that the shareholder vote has primacy in our system of corporate governance because it is the "ideological underpinning upon which the legitimacy of directorial power rests." [44] As former Chancellor Allen stated in *Sutton*

**39.** *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 92 n. 3 (1992).

**40.** Gordon, 19 Cardozo L.Rev. at 540.

**41.** *Id.*

**42.** *Moran*, 500 A.2d at 1355.

**43.** *Unocal*, 493 A.2d at 959 ("If the shareholders are displeased with the action of their elected representatives, the powers of corporate democracy are at their disposal to turn the board out,").

**44.** *Blasius*, 564 A.2d at 659; *see also*, *Unitrin*, 651 A.2d at 1378 ("This Court has been and remains assiduous in its concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising stockholders."); and *Paramount Communications, Inc. v. QVC Network Inc.*, Del.Supr., 637 A.2d 34, 42 (1994) ("Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights.").

*Holding Corp. v. DeSoto, Inc.*[45]:

> Provisions in corporate instruments that are intended principally to restrain or coerce the free exercise of the stockholder franchise are deeply suspect. The shareholder vote is the basis upon which an individual serving as a corporate director must rest his or her claim to legitimacy. Absent quite extraordinary circumstances, in my opinion, it constitutes a fundamental offense to the dignity of this corporate office for a director to use corporate power to seek to coerce shareholders in the exercise of the vote.

The defendants contend that the complaint fails to allege a valid stockholder disenfranchisement claim, because the Rights Plan does not on its face limit a dissident's ability to propose a slate or the shareholders' ability to cast a vote. The defendants also urge that even if the Plan might arguably have that effect, it could occur only in a very specific and unlikely context, namely, where (i) the hostile bidder makes a fair offer that it is willing to keep open for more than one year, (ii) the current board refuses to redeem the Rights, and (iii) the offeror wages two successful proxy fights and is committed to wage a third.

This argument, in my opinion, begs the issue and is specious. It begs the issue because the complaint does not claim that the Rights Plan facially restricts the shareholders' voting rights. What the complaint alleges is that the "dead hand" provision will either preclude a hostile bidder from waging a proxy contest altogether, or, if there should be a contest, it will coerce those shareholders who desire the hostile offer to succeed to vote for those directors who oppose it—the incumbent (and "Continuing") directors. Be-

sides missing the point, the argument is also specious, because the hypothetical case the defendants argue must exist for any disenfranchisement to occur, rests upon the unlikely assumption that the hostile bidder will keep its offer open for more than one year. Given the market risks inherent in financed hostile bids for public corporations, it is unrealistic to assume that many bidders would be willing to do that.

For these reasons, the plaintiffs *Blasius*-based breach of fiduciary duty claim is cognizable under Delaware law.

### b) The *Unocal/Unitrin* Fiduciary Duty Claim

The final issue is whether the complaint states a legally cognizable claim that the inclusion of the "dead hand" provision in the Rights Plan was an unreasonable defensive measure within the meaning of *Unocal*. I conclude that it does.

As a procedural matter, it merits emphasis that a claim under *Unocal* requires enhanced judicial scrutiny. In that context, the board has the burden to satisfy the Court that the board (1) "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (2) that its "defensive response was reasonable in relation to the threat posed."[46] Such scrutiny is, by its nature, fact-driven and requires a factual record. For that reason, as the Supreme Court recently observed, enhanced scrutiny "will usually not be satisfied by resting on a defense motion merely attacking the pleadings." Only "conclusory complaints without well-pleaded facts [may] be dis-

---

**45.** Del. Ch., C.A. No. 12051 at 2, Allen, C., 1991 WL 80223 (May 13, 1991). *Sutton Holding Corp.* involved a challenge to the validity of a board-adopted amendment to corporate pension plans, prohibiting their termination or reduction in benefits for five years in the event of a "change of control," which was defined as a new stockholder becoming a beneficial owner of 35% or more of the outstanding voting stock without prior approval of 2/3 of the board and a majority of the "continuing directors." Recognizing that the purpose of that provision was to foreclose a "raider" from financing any part of a takeover by resorting to the company's excess pension fund-

ing while permitting that fund to be available to directors approved by the incumbents ("continuing directors") for any corporate purpose, Chancellor Allen observed that the "... most critical defect, in my opinion, is the fact that the 'enemy' here, the raider, includes anyone that the shareholders elect but that the board has not nominated." *Id.* at 3 n. 3. That same "defect" is complained of here in connection with the Rights Plan.

**46.** *Unitrin*, 651 A.2d at 1373 (citing *Unocal*, 493 A.2d at 955).

missed early under Chancery Rule 12."[47]

 The complaint at issue here is far from conclusory. Under *Unitrin*, a defensive measure is disproportionate (*i.e.*, unreasonable) if it is either coercive or preclusive. The complaint alleges that the "dead hand" provision "disenfranchises shareholders by forcing them to vote for incumbent directors or their designees if shareholders want to be represented by a board entitled to exercise its full statutory prerogatives."[48] That is sufficient to claim that the "dead hand" provision is coercive. The complaint also alleges that that provision "makes an offer for the Company much more unlikely since it eliminates use of a proxy contest as a possible means to gain control ... [because] ... any directors elected in such a contest would still be unable to vote to redeem the pill;"[49] and "renders future contests for corporate control of Toll Brothers prohibitively expensive and effectively impossible."[50] A defensive measure is preclusive if it makes a bidder's ability to wage a successful proxy contest and gain control either "mathematically impossible" or "realistically unattainable."[51] These allegations are sufficient to state a claim that the "dead hand" provision makes a proxy contest "realistically unattainable," and therefore, is disproportionate and unreasonable under *Unocal*.

## IV. *CONCLUSION*

The Court concludes that for the reasons discussed above, the complaint states claims under Delaware law upon which relief can be granted.[52] Accordingly, the defendants' mo-

tion to dismiss is denied. **IT IS SO ORDERED.**

---

**47.** *In re Santa Fe Pacific Corp. Shareholder Lit.*, Del.Supr., 669 A.2d 59, 72 (1995).

**48.** Complaint at ¶ 26(b).

**49.** *Id.* at ¶ 26(a).

**50.** *Id.* at ¶ 27.

**51.** *Unitrin*, 651 A.2d at 1388–89; *see also, Gordon*, 19 Cardozo L.Rev. at 541.

**52.** For the sake of clarity, it must be emphasized that the "dead hand" provision at issue here is of

unlimited duration; that is, it remains effective during the entire life of the poison pill. There are also "dead hand" provisions of limited duration (*e.g.*, six months), which are sometimes referred to as "diluted" or "deferred redemption" provisions. Some commentators have urged that such limited duration "dead hand" provisions stand on a different footing and should be upheld; others have argued the contrary. See Lese, 96 Col. L.Rev. at 2210; and Gordon, 19 Cardozo L. Rev. at 542. In any event, this case does not involve the validity of a "dead hand" provision of limited duration, and nothing in this Opinion should be read as expressing a view or pronouncement on that subject.